UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

LANE WOODS,

                        Plaintiff,

        -against-                                5:16-CV-0007 (LEK/TWD)

TOMPKINS COUNTY,

                        Defendant.

_____

## MEMORANDUM-DECISION AND ORDER

## I.      INTRODUCTION

On January 4, 2016, pro se plaintiff Lane Woods commenced this action against

Tompkins County. Dkt. No. 1 ("Complaint"); see also Dkt. No. 11 ("Amended Complaint").[1]

Following the Court's September 20, 2016 decision granting in part and denying in part

Defendant's motion to dismiss, only Plaintiff's per se discrimination claim remains, brought

pursuant to Title II of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101,

et seq. Sept. 2016 Order.

Now before the Court are the parties' fully-briefed cross-motions for summary judgment.

Dkt. Nos. 61 ("Plaintiff's SJM"), 61-1 ("Plaintiff's Memorandum"), 61-2 ("Plaintiff's SMF"),

63 ("Opposition to Plaintiff's SJM"), 63-2 ("Response to Plaintiff's SMF"), 66 ("Reply to

Plaintiff's SJM"), 62 ("Defendant's SJM"), 62-1 ("Defendant's Memorandum"),

62-2 ("Defendant's SMF"), 62-3 at 5–50 ("Plaintiff's Deposition"), 64 ("Opposition to

_____

[1]  In her original Complaint, Plaintiff also named Stafkings Health Care Systems, Inc. as a
defendant. Compl. However, Plaintiff's claims against Stafkings were dismissed with prejudice
by the Court's February 29, 2016 order, which adopted the January 7, 2016
report-recommendation provided by the Honorable Thérèse Wiley Dancks, U.S. Magistrate
Judge. Dkt. Nos. 10 ("February 2016 Order"), 5 ("Report-Recommendation").

Defendant's SJM"), 67 ("Reply to Defendant's SJM"), 68 ("Sur-Reply to Defendant's SJM").

For the reasons set forth below, Plaintiff's SJM is denied, Defendant's SJM is granted, and

Plaintiff's case is dismissed.

## II.     BACKGROUND

### A.  Competence of Plaintiff's Documentary Evidence

As a preliminary matter, Defendant asks the Court to disregard all of the evidentiary

materials submitted by Plaintiff in connection with the pending motions. Opp'n Pl.'s SJM at 3.[2]

Defendant contends that "none of th[os]e documents"—which include, among other things,

multiple affidavits, letters, and medical records—"are competent, as they are not sworn to by

anyone." Id. (citation omitted). The Court finds Defendant's argument unavailing.

Defendant cites as support only Douglas v. Victor Group Capital, in which the district

court for the Southern District of New York found that, because "[t]he only medical evidence

[the plaintiff] submitted[—]several doctors letters[—]are inadmissible hearsay, [they] may not be

considered in opposition to a summary judgment motion." 21 F. Supp. 2d 379, 391–92

(S.D.N.Y. 1998) (citations omitted). In making that determination, the court in Douglas relied on

Rule 56(e) of the Federal Rules of Civil Procedure, which has since been substantially amended

and renumbered as Rule 56(c). Fed. R. Civ. P. 56(c) advisory committee's note to 2010

amendment. Rule 56(c)(2) still allows "[a] party [to] object that the material cited to support or

dispute a fact cannot be presented in a form that would be admissible in evidence." But

Defendant does not argue—and the Court sees no reason to find—that any of the materials

_____

[2] Cited page numbers refer to those generated by the Court's Electronic Filing System ("ECF") unless otherwise noted.

submitted by Plaintiff should be disqualified under that provision. Therefore, the Court will not strike Plaintiff's evidentiary materials from the record on those grounds.

Additionally, Defendant's argument that Plaintiff's materials are "not sworn," Opp'n Pl.'s SJM at 3, appears to overlook 28 U.S.C. § 1746, which has long allowed parties to "support[], evidence[], establish[], or prove[]" matters to be considered at summary judgment through unsworn "declaration[s], certificate[s], verification[s], or statement[s]." § 1746. Of course, § 1746 still requires all such writings to be signed, "subscribed by [the writer] as true under penalty of perjury, and dated." Defendant could have objected to multiple of Plaintiff's evidentiary materials on those grounds.[3] However, since Defendant failed to raise, much less provide any support for, that argument, and because the relevant materials largely present facts not disputed by the parties, the Court will exercise its discretion to consider those materials while deciding the pending motions. Fed. Trade. Comm'n v. Vantage Point Servs., LLC, 266 F. Supp. 3d 648, 654 (W.D.N.Y. 2017) ("[S]triking a declaration from the record is at the court's discretion." (citation omitted)); Verser v. Elyea, 80 F. App'x 522, 525 (7th Cir. 2003) ("[A] refusal to strike or disregard portions of an affidavit in a motion for summary judgment is

---

[3] For example, it appears that the following of Plaintiff's evidentiary documents have not been signed, subscribed to, and/or dated: (1) Exhibit D to Plaintiff's SJM—an affidavit purportedly from Plaintiff, Dkt. No. 61-4 at 3–7 ("Plaintiff's Undated Affidavit"); (2) Exhibit F to Plaintiff's SJM—an April 4, 2018 letter from Dr. Michael Waters, Dkt. No. 61-4 at 8 ("Waters 2018 Letter"); (3) Exhibit H of Plaintiff's SJM—a summary of Plaintiff's September 9, 2016 medical appointment with Dr. John-Paul Mead, Dkt. No. 61-4 at 11–13 ("September 2016 Appointment Summary"); (4) Exhibit N to Plaintiff's SJM—an April 6, 2018 letter from Dr. Zaneb Yaseen, Dkt. No. 61-4 at 23 ("Yaseen Letter"); (5) the second exhibit attached to Plaintiff's Opposition to Defendant's SJM—an August 9, 2018 email exchange between Plaintiff and Tammy Papperman, Dkt. No. 64 at 11 ("2018 Papperman Email"); and (6) the first exhibit attached to Plaintiff's Reply to Plaintiff's SJM—a November 21, 2017 letter from Dr. Kelly Uhl, Dkt. No. 66 at 4–5 ("Uhl Letter").

reviewed for an abuse of discretion, and as the defendants observe, [the plaintiff] admitted to the relevant portions of the unsigned statements.").

**B. Factual Background**

Unless otherwise specified, the facts set forth below are not disputed by the parties.

*1. Plaintiff's Personal and Medical History*

Plaintiff is a seventy-one year old woman who has lived in Tompkins County since May 6, 2014, when she moved there from Niagara County. Def.'s SMF ¶ 3; Opp'n Def.'s SJM at 4. From that date until sometime in the first half of 2016, Plaintiff lived in Trumansburg, a village located outside the City of Ithaca. Pl.'s Dep. at 20, 24–25.[4] Plaintiff then moved to Ithaca, into a private apartment located at 108 Aster Lane, where she lived at the time the pending SJMs were filed. Def.'s SMF ¶ 1; Opp'n Def.'s SJM at 4. On February 21, 2019, Plaintiff notified the Court that her home address had changed again, and that she now lived in a different private apartment complex in Ithaca, located at 106 Village Circle. Dkt. No. 71.

The parties agree that Plaintiff suffers from a variety of physical, mental, and emotional conditions, though there appears to be some confusion around the specifics of Plaintiff's medical history. See Opp'n Def.'s SJM at 4 (claiming that "Defendant['s SMF] incorrectly lists [Plaintiff's] disabilities with several errors," but failing to describe those errors). The Court has therefore conducted an independent review of the record, which indicates that Plaintiff suffers from the following: (1) morbid obesity, Def.'s SMF ¶ 1; Dkt. No. 70 at 3 ("Yaseen January 2018 Treatment Note"); (2) a birth defect in her "lower spine with half-formed vertebrae," Def.'s SMF

---

[4] The cited page numbers for this document refer to its internal pagination, not the page numbers generated by ECF.

¶ 1; Pl.'s Dep. at 16; (3) two artificial shoulders, one of which is permanently dislocated, Def.'s

SMF ¶ 1; Pl.'s Dep. at 16; Yaseen Jan. 2018 Treatment Note; (4) several herniated and

degenerative discs in her spinal column, Def.'s SMF ¶ 1; Pl.'s Dep. at 16; (5) multiple

hemangiomas of the spine, Pl.'s Dep. at 16; (6) syringomyelia of the spinal cord, id.;

(7) Madelung's deformity of the wrists, id. at 16–17; Dkt. No. 70 at 5 ("Waters March 2018

Treatment Note"); (8) diabetes, Def.'s SMF ¶ 1; Pl.'s Dep. at 17; (9) arthritis, Def.'s SMF ¶ 1;

Pl.'s Dep. at 17; (10) "venous insufficiency of the limbs," Pl.'s Dep. at 17; (11) paroxysmal

fibrillation of the heart, Def.'s SMF ¶ 1; Pl.'s Dep. at 17; (12) depression, Def.'s SMF ¶ 1; Pl.'s

Dep. at 18; (13) post-traumatic stress disorder ("PTSD"), Def.'s SMF ¶ 1; Pl.'s Dep. at 18;

(14) developmental trauma disorder, Def.'s SMF ¶ 1; Pl.'s Dep. at 18; and (15) obsessive

compulsive disorder ("OCD"), Def.'s SMF ¶ 1; Pl.'s Dep. at 18.

### 2. Public Services and Benefits Available to Plaintiff

Plaintiff's conditions entitle her to a variety of benefits through a number of different

government programs and agencies.

For example, Plaintiff participates in the New York State Nursing Home Transition and

Diversion ("NHTD") program, which is designed "to help people stay out of" nursing homes and

other clinical institutions. Pl.'s Dep. at 12, 14. Through that program, Plaintiff's 108 Aster Lane

apartment was equipped with a collection of adaptive medical equipment, including a queen size

hospital bed, a lift chair, an automatic door, and grab bars in the bathrooms. Id. at 15–16; Def.'s

SMF ¶ 4. Plaintiff also had (1) a personal emergency response system installed in her apartment

by Defendant's Office for the Aging, Pl.'s Dep. at 34; Def.'s SMF ¶ 4; (2) access to subsidized

transportation services through Defendant's Gadabout program, Pl.'s Dep. at 32; Def.'s SMF ¶ 4;

and (3) access to Defendant's Meals on Wheels program, though she did not utilize that service since her OCD "prevent[ed her] from eating" the food it provided, Pl.'s Dep. at 33–34, Def.'s SMF ¶ 4.[5]

Plaintiff also qualifies for Medicaid through the operation of "a supplemental needs trust." Pl.'s Dep. at 12. As part of its Medicaid program, New York offers beneficiaries the opportunity to procure personal care services ("PCS"), whereby qualified individuals can obtain the services of an in-home personal care aide to provide "some or total assistance with personal hygiene, dressing[,] and feeding; nutritional and environmental support functions; and health-related tasks." N.Y. Soc. Serv. Law § 365–a(2)(e); 18 N.Y.C.R.R. § 505.14(a). "As a Social Services Department, [Defendant] administers the Medicaid program in Tompkins County, including the provision of [PCS] to qualifying individuals." Def.'s SMF ¶ 7; Dkt. No. 62-4 at 1–5 ("First Bergman Affidavit") ¶ 8; N.Y. Soc. Serv. Law § 62(1).

During the first stage of the PCS-provision process—triggered by Defendant's receipt of a physician's order requesting aide services for a beneficiary—Defendant assigns a nurse to perform a medical evaluation of the individual. Pl.'s Dep. at 28–29. The goal of those evaluations—which must recur twice annually as long as the individual continues to request PCS, id.; First Bergman Aff. ¶ 8—is to "determine [the individual's] eligibility" for services and to "develop[] a care plan," Def.'s SMF ¶ 7; First Bergman Aff. ¶ 8; Pl.'s Dep. at 28–29; Opp'n

---

[5] The record does not indicate whether Plaintiff also had/has access to these services and equipment at her Trumansburg residence or in her new 106 Village Circle apartment. However, since neither party has notified the Court of any substantive changes in Plaintiff's living situation as a result of Plaintiff's address changes, the Court will assume for the purposes of this Memorandum-Decision and Order that all of Plaintiff's Tompkins County residences had the same medical equipment as her 108 Aster Lane apartment, and that her moves did not disrupt Defendant's provision of the above-listed services.

Def.'s SMF at 5. The individual's health and risk factors are evaluated using the "Uniform Assessment System," which scores his/her "need [for] a nursing home level of care." Dkt. No. 61-4 at 24–25 ("Papperman Letter"). "Nursing home level of care is confirmed for candidates scoring a [five] or higher on this assessment." Id. at 24.

However, Defendant is not itself "a licensed provider of [PCS] and has no employees licensed or qualified to provide such services." Def.'s SMF ¶ 7; First Bergman Aff. ¶¶ 8–9. Therefore, if Defendant deems an individual eligible for an in-home aide (i.e., if the individual scores a five or higher on the Uniform Assessment System), Defendant must refer the individual to one of the two private entities in Tompkins County licensed by the state to provide PCS—Stafkings and CareGivers. Def.'s SMF ¶ 8; First Bergman Aff. ¶ 16; Pl.'s Dep. at 24; Pl.'s Undated Aff. at 4. After notifying those entities of the individual's needs, Defendant can then directly "authorize[] payment for the benefits in the exact amount approved for such services by Medicaid." Def.'s SMF ¶ 7; First Bergman Aff. ¶ 8.

According to Defendant, "[t]here are two other possible sources of aides" for Medicaid beneficiaries, but they cannot be provided directly by Defendant either. Def.'s SMF ¶ 14. First, Medicaid-reimbursed services can be obtained through Visiting Nurse Services ("VNS"). Id. But New York's Medicaid regulations classify VNS as a provider of "home health services," not PCS, and therefore require a referral from a treating physician as a prerequisite to obtaining VNS's services. 18 N.Y.C.R.R. § 505.23(2); Def.'s SMF ¶ 14. Second, qualified individuals can receive PCS through the Consumer Directed Personal Attendant Program ("CDPAP"), a statewide Medicaid program administered locally by the Finger Lakes Independence Center.

18 N.Y.C.R.R. § 505.28; Def.'s SMF ¶ 15;[6] Pl.'s Dep. at 22. The CDPAP allows qualified beneficiaries to personally hire their own aide, then obtain reimbursement directly for the PCS that aide provides. § 505.28; Def.'s SMF ¶ 15; Pl.'s Dep. at 22.

### 3. Plaintiff's In-Home Aide Services

The parties agree that Defendant has consistently performed Plaintiff's required in-home aide evaluations every six months. Pl.'s Dep. at 28; Dkt. No. 63-1 at 1–2 ("Second Bergman Affidavit") ¶ 4; Uniform Assessment Reports. And though Plaintiff accuses Defendant's representatives of "deliberately skew[ing]" her evaluations "to reduce the apparent level of care required," Dkt. No. 66-1 ("Plaintiff's 2018 Affidavit") at 3, the parties also agree that Defendant has deemed Plaintiff eligible to receive PCS throughout the entire period of her residency in Tompkins County, First Bergman Aff. ¶ 10; Dkt. No. 63-1 at 4–19 ("Uniform Assessment Reports"); Pl.'s Undated Aff. at 4.

However, Plaintiff has actually received PCS during only a small fraction of her time in Tompkins County—for seventeen months from May 2014 to October 2015, and for another approximately five months during the summer and fall of 2016. Def.'s SMF ¶¶ 10–12; Pl.'s Dep. at 27. Although Plaintiff did receive home health services through VNS for an additional twenty-two months—from November 2015 to September 2017—she has not had an in-home aide of any kind for the last year and a half. Def.'s SMF ¶ 16; Pl.'s Dep. at 19–21.

---

[6] Due to a typographical error, the last two paragraphs in Defendant's SMF have both been numbered "15." To avoid confusion, the Court will refer to the first of these as paragraph 15 and the second as paragraph 16.

### a. Stafkings—May 2014 to October 2015

From approximately May 6, 2014 until October 5, 2015, Plaintiff received PCS through Defendant, provided by Stafkings. Pl.'s Dep. at 27; Dkt. No. 62-4 at 9–10 ("Stafkings Emails"). During most of that time, Stafkings provided Plaintiff with a "very satisfactory aide." Opp'n Def.'s SJM at 4. However, after that aide left to attend nursing school, Stafkings struggled to find a permanent replacement to service Plaintiff. Id.; Stafkings Emails.

According to two contemporaneous emails sent by Stafkings personnel to Plaintiff and Defendant, Stafkings provided Plaintiff with five aides following the nursing student's departure, but all five complained about Plaintiff's "demanding" and "stressful" manner, and four of them quit without notice. Stafkings Emails. Plaintiff objects to that version of events. Opp'n Def.'s SJM at 4. Although she admits that she "had a personality conflict with [Stafkings's] coordinator," Pl.'s Dep. at 26, Plaintiff claims that she "dismissed one aide for eloping when sent on an errand . . . , another decided to stay home and care for her mother . . . , and one was only a temp," Opp'n Def.'s SJM at 4. Regardless, both parties agree that, as of early October 2015, Stafkings "ha[d] no available staff willing and able to service" Plaintiff. Def.'s SMF ¶¶ 11–12; Stafkings Emails; Pl.'s Dep. at 27; Opp'n Def.'s SJM at 4; Pl.'s Undated Aff. at 4.

### b. CareGivers—Summer 2016 to November 2016

After Stafkings terminated Plaintiff's aide services, she communicated continuously with Defendant about the possibility of obtaining PCS from CareGivers, the only other private entity with which Defendant could contract to provide such services. Pl.'s Dep. at 24–25; Pl.'s Undated Aff. at 4. Finally, after Plaintiff moved from Trumansburg to Ithaca during the first half of 2016, "CareGivers did step in" to provide her PCS "for a couple hours a week." Pl.'s Dep. at 24–25. In

total, CareGivers provided Plaintiff with PCS for no more than five months, from the summer of 2016 until the following November. Id.; Dkt. No. 62-4 at 7 ("CareGivers Letter").

However, on November 16, 2016, CareGivers wrote Defendant to provide "formal notice" of the discontinuation of Plaintiff's services. CareGivers Ltr. In that letter, CareGivers accused Plaintiff of being "rude" and "threatening" to CareGivers staff following a disagreement over the scheduling of Plaintiff's services, and stated that CareGivers "w[ould] not service client[s] that are threatening" to its employees. Id. Plaintiff agrees that she grew frustrated over the agency's failure to properly schedule her PCS, and admits that she told a CareGivers staff member: "[Y]ou know what? I know the County doesn't care how you treat me, but maybe the lawyer will." Pl.'s Dep. at 26. According to Plaintiff, "as soon as [she] said the word [']lawyer['], . . . [CareGivers] wouldn't deal with [her] anymore, even though [she was] entitled to make a complaint about any treatment." Id.

### c. VNS—November 2015 to September 2017

Approximately one month after Stafkings's October 2015 termination of Plaintiff's PCS, Plaintiff started obtaining home health services through VNS. Pl.'s Dep. at 19–20.

Once again, Plaintiff claims that VNS initially staffed her with "a satisfactory aide." Id. at 19. But at some point during Plaintiff's two-year relationship with VNS, the agency "switched all [its] aides around," leaving Plaintiff with "a ringer" who "caused [her] more distress than help." Id. Specifically, Plaintiff accused the second aide of incompetence, because "[s]he couldn't keep any directions straight about [Plaintiff's] laundry," and found her both "lazy" and "not very helpful." Id. at 20–21. Therefore, in September 2017, Plaintiff asked the second aide not to come back, in the hope that VNS "would try [to] give [her] another aide." Id. at 21.

However, VNS did not have any other Medicaid-qualified aides on staff and had to discontinue

Plaintiff's service altogether. Id.

### d. The CDPAP

Plaintiff previously received PCS through New York's CDPAP while living in Niagara

County. Pl.'s Dep. at 22, 31. Defendant has notified Plaintiff that she is still eligible to receive

aide services through that program while living in Tompkins County, Def.'s SMF ¶ 15, but

Plaintiff has never done so, Pl.'s Dep. at 23–24.

Plaintiff claims that she "has made several attempts to find an aide by using the list [of

caregivers] maintained by the Finger Lakes Independence Center," but that "th[o]se efforts ended

in tears and frustration . . . because the list is poorly maintained. After many calls which were

wrong numbers, where people were not looking for employment, or failed to call back after

messages, Plaintiff did succeed in interviewing one potential aide, who turned out to be a

convict." Opp'n Def.'s SJM at 5; Pl.'s Dep. at 23. Plaintiff also claims that the CDPAP is poorly

maintained in Tompkins County, and that "the agency [in Ithaca] is just ripping off the system."

Pl.'s Dep. at 23.

### 4. Plaintiff's Health Post-September 2017

The parties disagree as to the changes in Plaintiff's health, if any, that resulted from her

inability to access PCS through Defendant.

Plaintiff claims that her physical condition "has deteriorated since [Defendant] has failed

to provide" her with "the required [services]." Pl.'s SMF ¶ 4. Specifically, Plaintiff points to her

development of "three new disabling conditions in her hands and wrists" since her aide services

were discontinued, and claims that her permanently dislocated shoulder condition "worsened"

during that time. Id.; Pl.'s Undated Aff. at 6. Plaintiff also asserts that, since losing her Stafkings aide in 2015, she has "not been able to put on a pair of socks or boots in winter weather," which has led her to "suffer a great deal from the cold while walking [her emotional support animal], traveling to medical appointments, grocery shopping, etc." Pl.'s Undated Aff. at 5. Finally, Plaintiff claims that she is unable to dress or wash herself, safely cook for herself, or use the toilet without assistance, problems which are exacerbated by the unavailability of PCS. Pl.'s 2018 Aff. ¶¶ 12–15.

Plaintiff also claims that her mental and emotional well-being has suffered since Stafkings and CareGivers ceased providing her PCS, and that her "depression sometimes becomes so severe that the issue of suicide surfaces repeatedly." Pl.'s Undated Aff. at 5. As support for that claim, Plaintiff submits two letters from her treating psychotherapist, Dr. Karen R. Burlew, dated February 6, 2016 and August 20, 2018. Dkt. No. 61-4 at 9 ("2016 Burlew Letter"); Dkt. No. 64 at 10 ("2018 Burlew Letter"). Both letters report that, following the termination of Plaintiff's relationship with Stafkings and CareGivers, Dr. Burlew has "observed a marked deterioration in [Plaintiff's] emotional and physical states, including severe symptoms of depression, anxiety, and intensified symptoms of PTSD." 2016 Burlew Ltr; 2018 Burlew Ltr.

Multiple of Plaintiff's treating physicians have commented that her medical conditions "mak[e] it difficult [for Plaintiff] to perform basic activities of daily living," 2018 Waters Ltr., and have recommended that she be provided with an in-home aide, id.; Yaseen Letter; Waters Mar. 2018 Treatment Note. One such physician, Dr. John-Paul D. Mead, even recommended in late 2016 that Plaintiff consider "apply[ing] for short-term rehabilitation stay" in a nursing home,

where she could be afforded "a higher level of care." Dkt. No. 61-4 at 11–13 ("Mead Treatment Note").

Defendant, on the other hand, contends that Plaintiff's lack of access to PCS "has not affected [Plaintiff's] ability to maintain [herself] in her own apartment, with a significant amount of equipment and services provided to her." Def.'s SMF ¶ 13. Defendant points to the results of Plaintiff's twice-annual care evaluations—as reflected in her Uniform Assessment Reports—as proof that Plaintiff's health has not declined and that she faces no increased risk of institutionalization. Opp'n Pl.'s SJM at 4. The scores Plaintiff achieved on those evaluations improved substantially between January 2016 and August 2016, Uniform Assessment Reports at 8–11 (showing that Plaintiff scored a sixteen in January 2016, but a ten in August 2016), and have since held steady, id. at 12–19.

### C. Procedural History

Plaintiff filed her Complaint on January 4, 2016, alleging discrimination and failure to accommodate in violation of Title II of the ADA. Compl. On January 29, 2016, after receiving Judge Dancks's Report-Recommendation, Plaintiff amended her complaint to remove Stafkings as a defendant and to correct certain typographical errors contained in her original pleading. Am. Compl.; see also Sept. 2016 Order at 3. The Court's February 2016 Order accepted the Amended Complaint for filing, deemed it the operative pleading, reviewed it pursuant to 28 U.S.C. § 1915, and determined that the claims set forth therein merited a response. Feb. 2016 Order at 2–3.

On April 26, 2016, Defendant filed a motion to dismiss. Dkt. No. 16 ("Motion to Dismiss"). The Court granted that Motion as to Plaintiff's failure to accommodate claim, Sept. 2016 Order at 9–11, but also (1) rejected Defendant's exhaustion argument, finding that

"Plaintiff need not have [had] a fair hearing before bringing this action in federal court," id. at 5–6; and (2) denied the Motion as to Plaintiff's discrimination claim, since the Amended Complaint plausibly alleged "that Defendant engaged in per se discrimination by putting Plaintiff at risk of being institutionalized," id. at 6–9; see also Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 597 (1999) (finding that the "unjustified isolation" of disabled persons in institutionalized care facilities can give rise to an actionable discrimination claim under the ADA).

Following discovery and a failed mediation, Plaintiff filed for summary judgment on July 30, 2018. Pl.'s SJM. In the memorandum attached to that motion, Plaintiff argues that "both . . . Plaintiff and Defendant agree on the material facts of [her] case," which prove that she "has been denied the benefits of . . . Defendant's Long Term Care Program, and has suffered significant deterioration in health which places her at risk of institutionalization, a category of discrimination under the ADA." Pl.'s Mem. at 5. In its Opposition to Plaintiff's SJM, Defendant only challenges one aspect of Plaintiff's argument: her representation that she faces a serious risk of institutionalization. Opp'n Pl.'s SJM at 3–4. Specifically, Defendant contends that (1) "none of the medical reports cited by [P]laintiff say that [she] is at serious risk of institutionalization; they merely opine that [P]laintiff would be better off with the assistance of nursing aides," id. at 4; (2) "none of the reports cited by [P]laintiff are made by people who even purport to be competent to determine whether a person should be placed in a nursing home," id.; and (3) the "objective evaluations" performed by UAS "absolutely refute" Plaintiff's claim that she is at serious risk of institutionalization, id.

Defendant then cross-moved for summary judgment on August 3, 2018, arguing that Plaintiff cannot maintain her ADA discrimination claim because Defendant "took no action that

placed [her] at an increased risk of institutionalization." Def.'s Mem. at 8–10. Rather, Defendant argues that "[i]t [wa]s the mistreatment of aides by [P]laintiff that result[ed] in [her] not receiving personal care aides," meaning Defendant cannot be held liable. Id. Defendant also reiterates the arguments contained in its Opposition to Plaintiff's SJM, which contend that "Plaintiff does not face the risk of institutionalization as contemplated by Olmstead and its progeny." Id. at 10–11. In her opposition papers, Plaintiff (1) cites to the statement of interest filed by the United States in Ball by Burba v. Kasich, 244 F. Supp. 3d 662 (S.D. Ohio 2017), which she interprets as supporting her claim that "her deterioration in health, safety[,] and welfare subsequent to Defendant's withdrawal of services has placed [Plaintiff] at risk of institutionalization," Opp'n Def.'s SJM at 6–8; and (2) argues that Defendant "is responsible for it's contractees' [sic] disability discrimination," id. at 8–9.

## III.  LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure instructs courts to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is "'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Thus, while "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment, "summary judgment will not lie if . . . the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.; see also Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991) ("Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted.").

The party seeking summary judgment bears the burden of informing the court of the basis for the motion and identifying those portions of the record that the moving party claims will demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The moving party is entitled to summary judgment when the nonmoving party carries the ultimate burden of proof and has failed "to establish the existence of an element essential to that party's case, and on which [the nonmoving] party will bear the burden of proof at trial." Id. at 322.

In attempting to repel a motion for summary judgment after the moving party has met its initial burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). At the same time, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). Thus, a court's duty in reviewing a motion for summary judgment is "carefully limited" to finding genuine disputes of fact, "not to deciding them." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

**IV.  DISCUSSION**

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." § 12132. In order to establish a violation of that statute, a plaintiff must demonstrate "'(1) that she is a qualified individual with a disability; (2) that she was excluded from participation in a public entity's services, programs[,] or activities or was otherwise

discriminated against by a public entity; and (3) that such exclusion or discrimination was due to her disability.'" Davis v. Shah, 821 F.3d 231, 259 (2d Cir. 2016) (quoting Fulton v. Goord, 591 F.3d 37, 43 (2d Cir. 2009).

Through § 12134(a) of the ADA, Congress authorized the Attorney General to "promulgate regulations . . . that implement" the Act. Pursuant to that grant of authority, the Attorney General issued 28 C.F.R. § 35.130, which established an integration principle "requiring a 'public entity [to] administer . . . programs . . . in the most integrated setting appropriate to the needs of qualified individuals with disabilities.'" Conn. Office of Prot. & Advocacy for Persons with Disabilities v. Conn., 706 F. Supp. 2d 266, 275 (D. Conn. 2010) (alterations in original) (quoting § 35.130(d)). "[T]he most integrated setting appropriate to the needs of qualified individuals with disabilities" is one that "enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible." 28 C.F.R. pt. 35, App. A, p. 450 (1998). Nevertheless, while a state must "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination," it need not do so if it "can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." § 35.130(b)(7). Further, the Attorney General specified that, while "[a] public entity may not administer a licensing or certification program in a manner that subjects qualified individuals with disabilities to discrimination on the basis of disability," "[t]he programs or activities of entities that are licensed or certified by a public entity are not, themselves, covered by this part." § 35.130(b)(6).

In Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581 (1999), the Supreme Court interpreted the so-called integration principle as establishing that the "unjustified institutional isolation of

persons with disabilities" constitutes a prohibited "form of discrimination." Id. at 600; see also id. at 607 (Stevens, J., concurring in part and concurring in the judgment) ("Unjustified disparate treatment, in this case, 'unjustified institutional isolation,' constitutes discrimination under the Americans with Disabilities Act of 1990."). In a subsequent interpretation of the Olmstead decision by the Department of Justice—which is "controlling unless plainly erroneous or inconsistent with the regulation," Auer v. Robbins, 519 U.S. 452, 461 (1997) (internal quotation marks omitted)—the Department wrote that a plaintiff could successfully establish a "sufficient risk of institutionalization to make out an Olmstead violation if a public entity's failure to provide community services . . . will likely cause a decline in health, safety, or welfare that would lead to the individual's eventual placement in an institution." U.S. Dep't of Justice, Statement of the Department of Justice of Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and Olmstead v. L.C., Q. 6 (last updated June 22, 2011), available at https://www.ada.gov/olmstead/q&a_olmstead.htm. Referencing that interpretation, the Second Circuit has confirmed that "a plaintiff may state a valid claim for disability discrimination by demonstrating that the defendant's actions pose a serious risk of institutionalization for disabled persons." Davis, 821 F.3d at 263.

### A. Plaintiff's Risk of Institutionalization

Defendant argues that the Court should grant its motion for summary judgment because "there is not a likelihood that [P]laintiff's health will decline to such an extent that she is likely to face institutionalization," much less that she faces a "serious" risk of being institutionalized. Def.'s Mem. at 10; Davis, 821 F.3d at 263. As evidence, Defendant points to the state programs to which Plaintiff has been provided access, and which have provided her with "extensive

adaptive equipment and extensive services to allow her to remain in her own apartment." Id. at 10–11.

Plaintiff, on the other hand, contends that "[d]uring the time she has not received the required [aide services, her] treating physicians [have] note[d] increasing disability in several areas . . . crucial to the provision of self[-]care." Pl.'s Mem. at 4. Specifically, Plaintiff points to the recent worsening of her shoulder, wrist, and hand conditions as impeding her ability to care for herself, and references Dr. Mead's 2016 treatment note (which recommended a short-term rehabilitation stay in a nursing home) as proving that she has suffered "significant deterioration of health and functional ability." Id. Plaintiff therefore argues that Defendant's failure to provide in-home care has placed her at risk of institutionalization in a manner sufficient to constitute discrimination under Olmstead as a matter of law. Id. at 5.

The Court disagrees with both Plaintiff and Defendant. The parties' conflicting characterizations of Plaintiff's health status and the risk that she may be institutionalized present a classic dispute of material fact. On the one hand, the record indicates that Plaintiff suffers from a variety of debilitating medical conditions, many of which would appear to necessitate her ongoing reliance on an in-residence nurse or aide. See, e.g., Pl.'s SMF ¶ 4; Pl.'s Undated Aff. at 5–6; Pl.'s 2018 Aff. ¶¶ 12–15; 2018 Waters Ltr., Yaseen Letter; Waters Mar. 2018 Treatment Note; Mead Treatment Note. But on the other hand, Defendant's twice-annual assessments of Plaintiff's health and risk factors indicate that her condition has actually improved over the last few years, implying that she may be at less risk of institutionalization now than three years ago. Uniform Assessment Reports.

Weighing those opinions and reports against one another to determine whether Plaintiff faces "a *serious* risk of institutionalization," Davis, 821 F.3d at 263 (emphasis added), lies outside the Court's purview at the summary judgment stage, see Gallo, 22 F.3d at 1224 (a court's duty in reviewing a motion for summary judgment is "carefully limited" to finding genuine disputes of fact, "not to deciding them"). Accordingly, the Court will not grant Defendant's SJM on those grounds, and must deny Plaintiff's SJM in its entirety, since she cannot show that she is entitled to judgment as a matter of law.

**B. Defendant's Involvement in Plaintiff's Alleged Injury**

Defendant also argues that Plaintiff's ADA claim must be dismissed because it was Plaintiff's own behavior, not Defendant's, that has led to her alleged increased risk of institutionalization. Def.'s Mem. at 10. Namely, Defendant contends that it "has done everything it can legally to provide [P]laintiff with personal care aides," including by "provid[ing] [P]laintiff's doctor with a form to identify her need for services; . . . send[ing] nurses to [P]laintiff's home to create a plan for services; . . . regularly notif[ying] the licensed providers of [P]laintiff's need for services;" and standing ready "to authorize payment for those services at legally mandated rates." Id. at 9. However, Plaintiff "is not getting service because of the poor relationships between [her] and the [licensed] providers"—private entities over which Defendant has no control, id.—and because of her "mistreat[ment of] their staff," id. at 9–10. Finding Defendant liable, it contends, would thus result in a "catch-22" whereby it would be required "to provide personal care aide services even [though it could] not actually provide the service because there are no available licen[s]ed providers." Id.

The ADA's integration mandate applies to contexts where a state uses private entities to deliver services to people with disabilities. Disability Advocates, Inc. v. Paterson, 598 F. Supp. 2d 289, 317 (E.D.N.Y. 2009); Radaszewski v. Maram, 383 F.3d 599, 614 (7th Cir. 2004). "An Olmstead claim concerns a public entity's obligation to make reasonable modifications to its service system to enable individuals with disabilities to receive services in the most integrated setting appropriate to their needs." Patterson, 598 F. Supp. 2d at 317. Public entities are required under the ADA to "*administer* services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d) (emphasis added). Defendant administers the county Medicaid program, deems individuals eligible for in-home aides, refers those eligible to private entities licensed to provide PCS, and then authorizes payments for benefits. Given this public administration, Title II applies. It is immaterial that Plaintiff receives the actual services via private agencies. Roland v. Cellucci, 52 F. Supp. 2d 231, 237 (D. Mass. 1999).

However, Defendant cannot be held responsible under Title II for actions of private actors themselves unless discrimination by those private actors is the result of the state's policies. See 28 C.F.R. § 35.130(b)(6) ("The programs or activities of entities that are licensed or certified by a public entity are not, themselves, covered by this part"). See also Dep't of Justice, ADA Technical Assistance Manual II–3.7200 (noting that "[t]he State is not accountable for discrimination in the . . . practices of a licensee if those practices are not the result of requirements or policies established by the State. Although licensing standards are covered by [T]itle II, the licensees' activities themselves are not covered. An activity does not become a 'program or activity' of a public entity merely because it is licensed by the public entity.").

Defendant has notified the licensed agencies about Plaintiff's needs, and is prepared to authorize payment. The refusal of service for Plaintiff that she claims puts her at risk of institutionalization results from decisions by the private personal aide agencies based on interactions with Plaintiff, and were not caused by any discriminatory methods of administration on the part of Defendant. Accordingly, Defendant cannot be held responsible under Title II for this alleged risk of institutionalization, and Plaintiff's claim must be dismissed.

It is presumably within Defendant's power, assuming licensure can be obtained from the state, to create a new home aide service run directly by the state, without outside private agencies, to serve Plaintiff. See Pl. Mem. (seeking a mandate requiring Defendant "to provide an aide immediately"). But such an expansion of services goes beyond Title II's mandate, which only requires states to "adhere to the ADA's nondiscrimination requirement with respect to the services they actually provide." Olmstead, 527 U.S. at 603 n.14. The goal of the Americans with Disabilities Act is to "assure that disabled individuals receive 'evenhanded treatment' in relation to the able-bodied." Doe v. Pfrommer, 148 F.3d 73, 83 (2d Cir. 1998). The ADA does not require that disabled persons be accommodated with new public benefits currently unavailable to anyone: "Even [when] plaintiffs have demonstrated that they are entitled to a reasonable accommodation, an accommodation that served as a grant of special substantive rights would not constitute appropriate relief." Henrietta D. v. Bloomberg, 331 F.3d 261, 282 (2d Cir. 2003). If a program's public services or benefits are available to all qualified individuals on an equal basis, no ADA claim stands: "The ADA requires only that a particular service provided to some not be denied to disabled people." Rodriguez, 197 F.3d at 618. The ADA "does not mandate provision

of new benefits" id. at 619, nor does it "establish an obligation to meet a disabled person's particular needs . . ." Pfrommer, 148 F.3d at 83.

Defendant administers PCS services using multiple private providers. The ADA does not require Defendant to create or establish a relationship with a new provider to serve Plaintiff alone.

Accordingly, Plaintiff's claim must be dismissed.

## V.    CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Plaintiff's Summary Judgment (Dkt. No. 61) is **DENIED**; and it is further

**ORDERED**, that Defendant's Summary Judgment  (Dkt. No. 62) is **GRANTED**; and it is further

**ORDERED**, that Plaintiff's Amended Complaint (Dkt. No. 11) is **DISMISSED**; and it is further

**ORDERED**, that the Clerk is directed to close this case; and it is further

**ORDERED**, that the Clerk serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED: March 28, 2019
        Albany, New York

Lawrence E. Kahn
U.S. District Judge